## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| Cheron Hayes, | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | CASE NO.: _____ |
| **vs.** | : | |
| | : | |
| The Walt Disney Company, | : | |
| Disney Parks, Experiences and | : | |
| Products, Inc., Disney Gift Card | : | |
| Services, Inc., Reedy Creek | : | |
| Improvement District, | : | |
| | | |
| **Defendants.** | | |

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, by and through the undersigned counsel, CHERON HAYES, and files this Complaint against Defendants THE WALT DISNEY COMPANY, DISNEY PARKS, EXPERIENCES AND PRODUCTS, INC. (also "DPEP"), DISNEY GIFT CARD SERVICES, INC., and REEDY CREEK IMPROVEMENT DISTRICT (also "RCID") (hereinafter referred to corporately as "Disney"), and alleges as follows:

## INTRODUCTION

For Ms. Hayes, Disney made her dreams come true.  She found her dream job as a part of Disney's cast and excelled in her work for the thousands of Disney guests she

1

served. Disney has been for decades a preferred place to work, carefully creating and maintaining an environment of harmony and inclusion.

In 2020, Disney's cast was rocked by the Covid-19 pandemic, but came together as Disney reopened its doors to guests and worked hard to make magic again. But, in only one year's time, by fall of 2021, Disney targeted cast members who declined Covid-19 vaccinations, including Ms. Hayes, who filed exemptions on grounds of religious faith, stating that taking these injections would violate their deeply held convictions.

Disney could and should have chosen to accommodate these religious beliefs in practice; indeed, to do so would have been to follow state and federal law, Disney's core principles and company policies, including its aspirational Five Keys. Instead, Disney denied Ms. Hayes' exemption requests, making clear that Disney irrationally feared Ms. Hayes as perpetually exposed or infectious with disease and a perpetual danger to other cast and guests. Disney then terminated Ms. Hayes' employment after fourteen years of faithful service.

## FACTUAL ALLEGATIONS

### Parties, Jurisdiction, and Venue

1. At all times material hereto, Plaintiff Cheron Hayes was a resident of Orange County, Florida and employed by Disney Gift Card Services, Inc.

2. **The Walt Disney Company** was organized in Delaware, is headquartered in Burbank, California, and is doing business in Florida, particularly in Orlando

2

and Osceola counties, through its wholly-owned subsidiaries, *inter alia* Defendants: **Disney Parks, Experiences, and Products, Inc.**, a California corporation organized in current form in 2008 and registered in Florida, and **Disney Gift Card Services, Inc.**, a Virginia corporation organized in 2013, registered in Florida.

3. **Reedy Creek Improvement District** is a local government *special district* established in 1967 by H.B. 486, Chapter 67-764, and carries out local government functions exclusively under Disney authority on Disney's property located within Orange and Osceola counties.

4. This case is severed from *Barbara Andreas, et. al v. The Walt Disney Company, et. al,* State Court Case No. 2022-CA-001697 (Osceola County), removed to MDFL – Orlando Division by Defendants on January 20, 2023, Federal Court Case No. 6:23-cv-00107-ACC-EJK.

5. The Court entered an order severing the case into seven separate lawsuits on January 24, 2023, and instructed that Plaintiff Andreas would retain Federal Case Number 6:23-cv-107 (Order, January 24, 2023, Docket No. 7 ¶ 1).

6. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Ms. Hayes' federal claims arise under 42 U.S.C. § 2000e-5(f), of the Civil Rights Act of 1964, as amended ("Title VII") and 42 U.S.C. § 1981a; and under 42 U.S.C. §§ 12117 of the Americans with Disabilities Act of 1990, as amended ("ADA").

7. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8. This Court has personal jurisdiction over Defendants in this matter, as all Disney entities herein named Defendants are either Florida corporations or deemed a resident foreign company that conducts its main business in Osceola and Orlando counties; and RCID, as a statutorily created special "district" local government, is subject to the jurisdiction of Florida courts, through which Disney corporately is also a local Florida governmental entity, subject to the jurisdiction of Florida courts.

9. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. §2000e(b), (g), (h) and 42 U.S.C. §12111(2), (5).

10. Venue is proper pursuant to 28 U.S.C. §1391, because the wrongful acts and omissions of Disney giving rise to Ms. Hayes' claims occurred in the District where Defendant maintains its central office, and because Defendant is deemed to reside in this District pursuant to § 1391(c)(2).

11. All conditions precedent to this action have occurred, have been performed, or have been waived.

**Disney's Covid-19 Vaccinate-or-Terminate Mandate**

12. When the national state of emergency over the Covid-19 pandemic was

announced, Disney closed temporarily beginning March 15, 2020, and reopened less than four months later.

13. Upon reopening, Disney's safety protocols for Covid-19 included use of double face masks then acceptable by the CDC (cloth accepted) and social distancing by cast members and guests.  For only certain cast, face shields or goggles might be required based on proximity to guests.

14. Cast who were feeling sick or who tested positive for Covid-19 were to isolate at home for five days or until the end of symptoms; wear facial covering at work for an additional five days and socially distance by 6 feet when removing facial covering; and report Covid-19 in the HR cast member portal (as well as to DPEP.Contact.Tracing@disney.com if they reported sick due to positive test). Those who were "unable to wear a face covering while working" were required to stay at home and not report to work for ten days following exposure or until after symptoms ceased.  **Exhibit A**[1]

15. On July 30, 2021, Disney announced to its entire U.S. cast a vaccinate or terminate Covid-19 policy.  According to the policy, all subject cast members would have to "verify" full vaccination status by a company deadline of September 30, 2021.  **Exhibit B**

---

[1] These protocols remained in place, even after Covid-19 vaccination was publicly available in late 2020, and even after Disney's vaccinate or terminate mandate was issued in July 2021, and even simultaneously to Disney's current Augmented Protocols for cast unvaccinated for Covid-19.  At no time did Disney require guests to disclose or verify their Covid-19 vaccination status.

16. Upon information and belief, Defendant DPEP is an entity that has significant design and implementation authority as well as enforcement oversight regarding Disney's vaccine mandate in Florida, including but not limited to "restrictions" and "accommodations" requested against the Covid-19 shots, despite the mandate announcement coming from Mr. Paul Richardson, Sr. Executive Vice President and Chief HR Officer at Defendant The Walt Disney Company.

17. The Covid-19 vaccination was "a condition of [] continued employment by The Walt Disney Company" and specified that "fully vaccinated" meant two weeks from the final dose of any two-dose Covid-19 vaccination or the sole dose of the single-dose option.  The Notice also specified that, until impact bargaining completed with union member employees, the mandate only applied as to non-union employees.  Employees subject to collective bargaining agreements would be subject to terms as specified in their respective MOUs reached on the mandate.

18. Apparently, the dire nature of the urgency of obtaining the Covid-19 vaccination was subject to effective negotiation.  Disney informed all cast in September 2021 that various unions involved in representation of cast members had reached agreements regarding extended deadlines, including but not limited to: STCU (Service Trades Council Union) and AEA (Actors Equity Association) extended the deadline from September 30 to October 22; AFM (American Federation of Musicians) Local 389 to October 31; CMC (Craft Maintenance Council) and BVCC (Buena Vista Construction Company)

secured November 1 extended deadline; and SPFPA (Security, Police & Fire Professionals of America) Local 603 secured a November 7 deadline. Other unions were still in negotiations. Ms. Hayes was not a member of a union.

19. From the initial announcement until November 18, 2021, cast members were bombarded with many email notices, as well as managerial texts and warnings, to "verify" their Covid-19 vaccination status as fully vaccinated in the online Cast Member Hub.

20. On November 19, Governor DeSantis signed into law Fl. Stat. §381.00317 and §112.0441, rendering unlawful any further "vaccinate or terminate" Covid-19 mandates by Florida employers.

**Disney's Discriminatory Augmented Health & Safety Protocols**

21. That same day, Disney sent an apparently targeted email **Exhibit C,** to cast members who reside or work in Florida and had "not yet verified [] COVID-19 vaccination status with the company" nor "been granted an accommodation." The email stated that Disney would "pause the enforcement" of the mandatory vaccine policy for "Florida-based Cast Members and employees" due both to the new Florida law passed and OSHA's Emergency Temporary Standard (issued November 5, 2021) being stayed by the U.S. Court of Appeals for the Fifth Circuit on November 12, 2021. The email also pointed out that Disney determined 90% of its Florida staff had complied and were fully vaccinated at that time.

22. Disney still required Covid-19 unvaccinated employees to verify their

7

unvaccinated status through TrustAssure process, and stated plainly that those who did not verify status would be considered unvaccinated. The notice also provided a link to "safety protocols" cast members who were not verified as "fully vaccinated" would be required to follow, "including face coverings and physical distancing," with no additional details thereto.

23. The TrustAssure "verification" program implicates Fl. Stat. § 381.00316's prohibition on business or governmental entities requiring "any documentation certifying COVID-19 vaccination or postinfection recovery to gain access to, entry upon, or service" from the business or governmental entity.

24. Moreover, in the terms of the enforcement of the "Augmented Protocols," the policy is a *de facto* Covid-19 vaccine mandate, in violation of Fl. Stat. § 381.00317 and § 112.0441. From a FAQ for leadership, it is clear the Augmented Protocols are not an exemption under the Florida law, are not voluntarily applied for, and refusal to comply despite other bases for exemption will result in discipline and termination:

> **Why are some Cast required to wear a N95 mask instead of a Disney-supplied face covering?**
> These safety protocols are in place for those who have not verified their vaccination status through TrustAssure. A N95 mask is required for higher contact roles with indoor extended interaction with another individual.
>
> **What happens if I don't follow the Augmented Safety Protocols?**
> Non-compliance with the Augmented Safety Protocols may result in disciplinary action, up to and including termination.
>
> **Do these Augmented Safety Protocols apply to Cast who verified their vaccination status through TrustAssure?**
> No.

25. Over time, and specifically in 2021 through 2022, after vaccination became

available to the public, Disney modified its general Covid-19 safety protocols, depending on location and vaccination status – dropping masking outdoors, then dropping social distancing. On November 8, 2021, vaccinated cast would no longer be required to wear facial covering outside except "on-stage", meaning around guests.

26. By mid-February, 2022, vaccinated cast were no longer required to wear any facial coverings in any location except on Disney transport. Ultimately by mid-April even the restriction to wear facial coverings on Disney transport lifted for vaccinated cast.

27. On February 24, 2022, the Florida Department of Health issued new guidelines no longer advising businesses to require facial coverings for any employees, on the grounds there is no proven significant clinical benefit against (Covid-19) infection for facial coverings among the general population.

28. Notwithstanding this state-issued health guideline, Disney continued its own policies until May 10, 2022, when it announced that vaccinated cast could follow local government mask policies. Unvaccinated employees were still required to abide by the Augmented Protocols, despite state health guidance.

29. Cast members quickly learned that Disney's policy in lieu of a now-unlawful "vaccinate or terminate" scheme was not status quo under general Covid-19 safety protocols, but a new discriminatory scheme that singled out visually and physically cast members who were unvaccinated for Covid-19. Disney also declared their new "Augmented Health & Safety Protocols" (hereinafter

"Augmented Protocols") as "accommodations" for some approved exemptions as of the fall of 2021.

30. The Augmented Protocols consisted of harsh isolation and restrictions, making it nearly impossible to find a compliant manner and location in which to eat or drink while on shift.  The Augmented Protocols effectively added to and made permanent on a daily basis, indefinitely, the Disney Covid policy for Covid-19 positive cast, cast who were symptomatically sick, and cast who were known to have been exposed to Covid-19.   **Exhibit A.**

### COVID-19 Augmented Health & Safety Protocols

Employees and Cast Members who are required to follow the COVID-19 Augmented Health and Safety Protocols must adhere to the following:

- Whether indoors or outdoors, a Disney-supplied face covering must be worn at all times. In addition, when indoors and within three (3) feet of others, a face shield or safety glasses must also be worn.
- You may only remove your face covering if:
  - You are alone in an office with the door shut.
  - You are performing tasks in the approved Green Zone.
  - You are actively performing onstage in a COVID-blocked entertainment offering and maintaining six (6) feet of distance from others.
  - You are six (6) feet of distancing from others and actively eating or drinking.
- If eating or drinking in the workplace, you must remain no less than six (6) feet from others in order to remove your face covering.
- Instead of a Disney-supplied face covering, employees and Cast Members in select high-contact roles may be required to wear a Disney-supplied N-95 mask instead and at all times, both indoors and outdoors. **In addition, when indoors and within three (3) feet of others, a face shield or safety glasses must also be worn.**

*Please note: Your leader and/or Human Resources (HR) will inform you if you are required to follow the Augmented Health & Safety Protocols. This guidance applies only to those employees and Cast Members who have been notified by their leadership and/or who have received an approved accommodations through the Employee Relations process.*

31. Written versions of the Augmented Protocols Prior to May 2022 did not specify any definition of cast members subject to the Augmented Protocols, nor show a

date of enforcement nor a date by which these harsh restrictions will be lifted, nor if any conditions precedent may trigger the termination of these Protocols.

32. The Augmented Protocols changed from time to time, and on May 2, 2022, the extreme facial coverings were enforceable indoors as to "select roles" which "may be designated as high contact"; but guests and unvaccinated staff could elect not to use any facial covering.  Additionally, all unvaccinated life guards, both indoors and outdoors "must use a ViroMax viral and bacterial filter while actively performing CPR."

33. The federal Occupational Health and Safety Administration ("OHSA") provides guidance and regulation, as well as enforcement of compliance regarding workplace safety.  Disney's requirement that certain (Covid-19 unvaccinated) employees wear N-95 PPE, indicates Disney's reliance on particular OSHA standards for handling hazardous substances in the workplace.  Disney's accommodations, named "permanent restrictions", for those unvaccinated for religious reasons required cast members to enter the "OSHA respiratory program" at Disney.

34. Whether an (Covid-19) unvaccinated cast member is required to enter the respiratory program or not is ostensibly based on whether the cast member him or herself was in a "high contact role," not whether there were environmental hazards or toxins from which to protect cast members in the workplace.  **Exhibit D**

35. However, the OSHA rules regarding hazardous substance precautions are not

those applicable to OSHA guidance regarding Covid-19 precautions. For example, workplaces deemed to have possible toxic materials and contaminated air include shipyards, marine terminals, and construction.[2] Disney "restrictions" requiring adherence to a respiratory program were required in public-facing hospitality and service roles in theme parks, resorts and other non-industrial, non-medical services workplaces.

36. Indeed, Disney's requirement that Covid-19 unvaccinated, "unverified" cast with religious exemption requests wear respirators under the Augmented Protocols contravenes OSHA standards for workplace safety in the presence of hazardous substances. Proper training must be given when wearing respirators like N95 masks, and OSHA, as well as respirator manufacturers recognize the likelihood of "hazards associated with the use of the respirator," such that extended use of the facial covering without respite is against proper guidance.[3]

37. Manufacturer guidance regarding respirators like N95 masks also clearly warn that the respirators may be used in the event of "exposures to certain airborne biological particles (e.g. viruses, mold, *Bacillus anthracis, Mycobacterium tuberculosis,* etc) but cannot eliminate the risk of contracting infection, illness, or disease." The instructions further specify "limitations" of use of PPE, including

---

[2] See, eg: https://www.osha.gov/coronavirus/safework#ftn1, last accessed December 21, 2022, *cf* Standard No. 1910.134, *Personal Protective Equipment; Respiratory protection,* at https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134, last accessed December 21, 2022.
[3] *Id.* and see **Exhibit E,** 3M Manufacturer specifications, user instructions, and warning regarding Aura™ Particulate Respirator N95.

that the "respirator is designed for occupational/professional use by adults who are properly trained in their use and limitations.  Individuals with a compromised respiratory system…should consult a physician and complete a medical evaluation prior to use."  Respirators also have a "shelf life" or expiration date in their packaging and must be stored in proper temperature and humidity conditions.  **Exhibit E.**

38. By early August, the Centers for Disease Control ("CDC") issued its advisory that there was no health or safety basis upon which to engage in different policies or treatment toward the Covid-19 vaccinated and unvaccinated.

39. On August 16, 2022, Disney finally dropped enforcement of its harsh and discriminatory Augmented Protocols.  **Exhibit F.**  At all times relevant to Ms. Hayes' claims in this complaint, Disney continued to require Covid-19 vaccination as a prerequisite for hire or rehire.  This announcement came within days of OSHA's Guidance Update reflecting CDC changed guidance against disparate treatment of Covid-19 vaccinated and unvaccinated.  However, the announcement made no admission of the unlawful nature of the humiliating and discriminatory Augmented Protocols.  Rather, the notice indicated Disney was free to engage in open discrimination in the future in the same fashion: "These protocols are subject to change at any time.  Employees represented by a union/Return-to-Work Agreement, please consult your leader to understand what protocols apply to you."

**Reedy Creek Improvement District**

40. Defendant The Walt Disney Company acquired the land that became Reedy Creek Improvement District in the 1960s.  By 1966, the landowners – all Disney subsidiary business entities – petitioned the Circuit Court of the Ninth Judicial Circuit  for creation of the "Reedy Creek Drainage District under Fl. Stat. § 298, *et seq.*, which was then incorporated as a public corporation on May 13, 1966.

41. In accordance with Mr. Walt Disney's vision for the property, Disney then petitioned the Florida State Legislature for the creation of the "Reedy Creek Improvement District," which was a virtually autonomous local Florida government as a *special district*, created by the Reedy Creek Improvement Act, signed into law on May 12, 1967.[4]

42. RCID is an entire district, or local government, that carries out all the basic functions of a local government.  Prior to the creation of RCID, these services for this region were originally and solely performed by the governments of Orange and Osceola Counties.  These services include:

- Law enforcement - Disney contracts with Orange and Osceola County local law enforcement agencies
- Fire Department
- Environmental Protection - through the donation of land to the state for conservation easements
- Creation and Enforcement of its own building codes
- Utilities - wastewater treatment and collection, water reclamation,

---

[4] Chapter 67-764 created the Reedy Creek Improvement District, see https://www.rcid.org/wp-content/uploads/2015/10/RCID-Charter.pdf last accessed on December 21, 2022; Chapter 67-1104 established the City of Bay Lake; and Chapter 67-1965 established the City of Reedy Creek (later renamed as the City of Lake Buena Vista around 1970.)

electric generation and distribution, solid waste disposal, potable water, natural gas distribution, and hot and chilled water distribution are managed through Reedy Creek Energy Services, which has been merged with the Walt Disney World Company

- Roads - Many of the main roads in the District are public roads maintained by the District, while minor roads and roads dead-ending at attractions are private roads maintained by Disney; in addition, state-maintained Interstate 4 and U.S. Highway 192 pass through the District, as does part of the right-of-way of County Road 535 (formerly State Road 535).

- Transportation - Disney provides transportation for guests and employees in the form of buses, ferries, and monorails, under the name Disney Transport. In addition, several Lynx public bus routes enter the District, with half-hour service between the Transportation and Ticket Center (and backstage areas at the Magic Kingdom) and Downtown Orlando and Kissimmee, and once-a-day service to more points, intended mainly for cleaning staff. Half-hourly service is provided, via Lynx, to Orlando International Airport

43. Disney exercises complete control of RCID and enjoys a self-beneficial arrangement whereby it pays local taxes to the RCID, which in turn, reinvests that tax revenue into Disney enterprises and businesses. The United States Court for Middle the District of Florida has found that "[t]he evidence does not support the contention that Disney and Reedy Creek are completely separate entities that do not exert control over each other, rather than "common employers," "joint employers," or parts of an agent/principal relationship." *See Lang et. al v. Reedy Creek Improvement District*, 888 F. Supp. 1143 (M.D. Fla. 1995). Thus, under Florida Law, Defendant The Walt Disney Company, and collectively, Disney subsidiaries operating within Florida, constitute a local government entity, subject to Florida constitutional and statutory requirements of public employers.

44. The municipalities Bay Lake and Lake Buena Vista which are located within RCID function as company towns within the Disney company *district* under Florida law.  RCID property is open for use by the general public, serving an average of 250,000 people in the Walt Disney World parks and resorts on a daily basis with over 75,000 employees in Florida alone.

45. Indeed, the state of Florida has now passed legislation stripping The Walt Disney Company of certain of its governmental power and autonomy through RCID. At the time of this filing, the bill as passed is pending action by Governor Ron DeSantis.  See CS-HB9B.

### Ms. Hayes' Employment with Disney

46. Plaintiff Cheron Hayes was first hired by Disney in mid-2007 as a Financial Analyst supporting Parks Forecasting and Consolidation and very quickly in 2008 promoted to the position of Senior Financial Analyst with the Walt Disney World Resorts team, supporting the Coronado Springs Convention Resort.  She later supported the Merchandise Line of Business team and finally was moved to support Defendant Disney Gift Card Services, Inc., where she remained until her unlawful termination.

47. In her position, Ms. Hayes was responsible for maintaining the financial health of the Gift Card business, including overall account reconciliations, project management, maintenance of system financial master data, and financial controls.  She had significant responsibility in managing Disney's $180,000,000.00 gift card liability account balances.

48. Prior to 2021 and her unlawful termination based on lack of Covid-19 vaccination, Ms. Hayes had no discipline or negative employment history with Disney for over fourteen years.

49. When the Covid-19 state of emergency hit Florida, Ms. Hayes was transitioned to fully remote work. Even after Disney returned to in-person employment status for cast, Ms. Hayes remained in remote employment status.

50. In July 2021, when Disney announced its vaccinate-or-terminate mandate, Disney required Ms. Hayes to comply with the mandate by October, despite her 100% virtual position of employment and many years of faithful and excellent job performance. Although it was common knowledge in her office that Ms. Hayes is a devout Christian and she spoke with Disney HR regarding her faith and belief, Ms. Hayes had already heard from other cast members that religious exemptions were not being approved by Disney, so this had a chilling effect on Ms. Hayes' filing a religious exemption.

51. She then filed a request for medical exemption on August 10, 2021, based on her prior severe adverse reactions to influenza and shingles vaccines. Her doctor asserted that if she were to get Covid-19 shots, she should have them administered in a hospital in light of her history of severe adverse vaccine effects and allergies to common vaccine ingredients. **Exhibit G**

52. In response to her request, Disney denied her request for continued remote work, regular testing and/or wearing face covering and ignored the fact that she was

already purely a remote worker and would not be in any contact with other cast members or guests.

53. Mere days before Fl. Stat. §381.00317 and §112.0441 went into effect on November 19, 2021, Disney terminated Ms. Hayes' employment on November 8, 2021.

54. Ms. Hayes learned shortly thereafter that she was placed on Disney's "Rehire Status" list in light of the Florida law, and she contacted her management regularly to inquire regarding her status of rehire for approximately two months.  No one returned her calls or provided her details regarding possible return to work.  Upon information and belief, Disney did bring back to work at least five cast members from Ms. Hayes' department after the November Florida law prohibiting vaccinate-or-terminate mandates.

55. Ms. Hayes then applied for a new position in January 2022, and Disney offered her a position as Senior Financial Accounting Analyst – a position based in Florida which would have both remote and in-person office employment. Disney also reinstated her credentials in light of the pending offer of new employment.

56. Again, despite federal and state law, Disney required Ms. Hayes to be Covid-19 vaccinated in order to obtain the job Disney offered her.  She submitted both a religious and medical exemption, pursuant to Florida and federal law on February 18 and 25, 2022.  **Exhibit H**

57. Disney denied both exemptions.  It provided no reason at all for denying an exemption based on Ms. Hayes' sincerely held religious beliefs; and Disney did not accept her medical accommodation request. Only after Ms. Hayes hired counsel to assist her, did Disney respond on March 25, 2022, that "she did not provide adequate documentation from a health care provider supporting her request" and that "the company was unable to determine whether Ms. Hayes was prevented from receiving the COVID-19 vaccine due to a sincerely held religious belief, practice, or observance," which led to denial of both accommodation requests.

58. Not to be deterred from working in her dream company, Ms. Hayes yet again applied for another new position as Senior Analyst Revenue Management Projects in the Revenue Management organization and was approved through the interview process up to receiving an offer in mid-September of 2022.

59. Disney informed Ms. Hayes that this offer was contingent upon her passing a background check, biometrics, and a Covid-19 vaccine requirement.  For a third time, Ms. Hayes asserted her exemption request, informing Disney that she had religious basis to refuse the Covid-19 vaccine and that she understood Florida law to prohibit Disney from precluding her employment based on the Covid-19 vaccine.

60. Without any communication with Ms. Hayes, nor asking her for any documentation or exemption request pursuant to Fl. Stat. §381.00317, Disney's recruiter working with Ms. Hayes represented to her that he had entered a

request on Ms. Hayes' behalf for religious accommodation.  On September 26, 2022, he notified Ms. Hayes that her accommodations were again denied.

61. Ms. Hayes submitted her claims to EEOC.  She received her Notice of Right to Sue on September 30, 2022.

**COUNT I**
**DISCRIMINATION CONTRARY TO FLORIDA CIVIL RIGHTS ACT**
**FL STAT § 760.07, § 760.10**
*Against All Defendants*

62. Paragraphs 1-61 are hereby incorporated by reference as if fully restated.

63. The Florida Civil Rights Act ("FL CRA") prohibits an employer from discriminating against an employee "because of race, color, religion, gender, pregnancy, national origin, age, handicap, or marital status in the areas of education, employment, or public accommodations." Fl. Stat. § 760.07.

64. Prohibited employment practices include:

a. "(1)(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

b. "(1)(b) To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race,

color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

c. "(2) to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status or to classify or refer for employment any individual on the basis of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

d. "(6) to print, or cause to be printed or published, any notice or advertisement relating to employment, membership, classification, referral for employment, or apprenticeship or other training, indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, pregnancy, national origin, age, absence of handicap, or marital status."

Fl. Stat. § 760.10.

65. Disney is subject to FL CRA, as an employer "employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year…." Fl. Stat. § 760.02(7).

66. Disney engaged in prohibited employment practices under FL CRA by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of their religious belief against covid-19 vaccination

and Disney's perception of their disability relating to or arising from their medical status.

67. Disney engaged in prohibited employment practices under FL CRA when it failed to accommodate Ms. Hayes, particularly when accommodation would have been equivalent to status quo of her fully remote position.

68. Disney engaged in prohibited employment practices under FL CRA when, upon denying Ms. Hayes' medical accommodation request - the equivalent of the status quo of her fully remote position - Disney unlawfully terminated her employment.

69. Disney engaged in prohibited employment practices under FL CRA when it failed to provide accommodation for Ms. Hayes based on her religious and medical exemption requests during the application process between November 2021 and September 2022 for multiple positions for which she was qualified and for which she was presented an offer by Disney.

70. Disney engaged in prohibited employment practices under FL CRA when, upon denying Ms. Hayes' accommodations requests based on her sincerely held religious beliefs and her medical status, Disney rescinded its offers of employment to her and refused to rehire her for multiple positions for which she was qualified in the period between November 2021 and September 2022.

71. Disney engaged in prohibited employment practices under FL CRA when it perceived Plaintiff Hayes as disabled and unable to complete the functions of her job in her medical status and unlawfully terminated her on the basis of this

perception.

72. Even though Plaintiff clearly posed no health threat to Florida Disney employees, particularly as she was nowhere physically present near Disney employees and guests, Disney treated Plaintiff as though she were a continually contagious vector of disease and dangerous.

73. Indeed, Disney's improper "cherry-picking" of OSHA Rules and guidelines regarding industrial environment hazards and toxic materials to force only those cast like Ms. Hayes whom Disney perceived as disabled and dangerous to wear PPE for extended periods without respite (which were the "accommodations" provided by Disney to other cast, but denied to Ms. Hayes personally as accommodation), illustrates Disney's true sentiment and message that Ms. Hayes *is* the toxic substance or environmental hazard in the Disney workplace.

74. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Ms. Hayes' equal employment opportunities and her economic and non-economic damages.  Disney's unlawful conduct has caused Plaintiff damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of her civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for her religious beliefs and perceived disability.

75. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiff so as to entitle her to an award of punitive damages

against Disney, to deter it, and others, from such conduct in the future.

76. Plaintiff has exhausted her administrative remedies prior to bringing this claim before this Court.  Fl. Stat. § 760.11.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, order Disney to reinstate her employment, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT II
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED ("TITLE VII") 42 U.S.C. §§ 2000e, *et seq*; DISCRIMINATION ON THE BASIS OF RELIGIOUS BELIEF AND PRACTICE
### *Against All Defendants*

77. Paragraphs 1-61 are hereby incorporated by reference as if fully restated.

78. Title VII (42 U.S.C. § 2000e-2(a)) provides that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

24

79. Religion under the statute "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). It is well established in the law that part of religious observance and practice may involve refusal of medical treatment and vaccination.

80. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. §2000e(b), (g), (h) and 42 U.S.C. §12111(2), (5).

81. Disney engaged in prohibited employment practices under Title VII by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of their religious belief against covid-19 vaccination.

82. Disney engaged in prohibited employment practices under Title VII when it failed to accommodate Ms. Hayes particularly when accommodation would have been equivalent to *status quo* of her fully remote position and Disney was aware or should have been aware that Ms. Hayes would seek a religious accommodation against its vaccinate-or-terminate Covid-19 mandate.

83. Disney engaged in prohibited employment practices under Title VII when it failed to provide accommodation for Ms. Hayes based on her religious

exemption requests during the application process between November 2021 and September 2022 for multiple positions for which she was qualified and for which she was presented an offer by Disney.

84. Disney engaged in prohibited employment practices under Title VII when, upon denying Ms. Hayes' accommodations requests based on her sincerely held religious beliefs, Disney rescinded its offers of employment to her and refused to rehire her for multiple positions for which she was qualified in the period between November 2021 and September 2022.

85. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Ms. Hayes' equal employment opportunities and her economic and non-economic damages.  Disney's unlawful conduct has caused Plaintiff damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of her civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for her religious beliefs.

86. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiffs so as to entitle her to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

87. Plaintiff has exhausted her administrative remedies prior to bringing this claim before this Court.  42 U.S.C. § 2000e-5.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, order Disney to reinstate her employment, order Disney to cease

enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

**COUNT III**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990,**
**AS AMENDED ("ADA") 42 U.S.C. §§ 12111, *et seq*;**
**DISCRIMINATION ON THE BASIS OF PERCEIVED DISABILITY**
*Against All Defendants*

88. Paragraphs 1-61 are hereby incorporated by reference as if fully restated.

89. Plaintiff is a "qualified individual" who was an employee of Disney, as defined under the ADA. 42 U.S.C. § 12111(4), (8).  Plaintiff performed the essential functions of her position admirably for the span of fourteen years, using Disney's universally applied Covid-19 safety policies for protection.  Ms. Hayes' position was 100% remote.

90. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. §2000e(b), (g), (h) and 42 U.S.C. §12111(2), (5).

91. The ADA prohibits discrimination against disabled persons in the employment context.  An employee is considered to have a disability if he or she: has "(A) a physical or mental impairment that substantially limits one or more of that person's major life activities; (B) has a record of such impairment; or (C) is regarded as having such an impairment…." 42 U.S.C § 12102(1).

92. To establish a disability under the third definition, being regarded as having an impairment, the ADA provides:

> (A)    An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>
> (B)    Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.
>
> 42 U.S.C. § 12102(3).

93. At all relevant times material to this action, Covid-19 was a well-known, highly contagious, and sometimes deadly virus that has resulted in a global pandemic. Furthermore, Disney's strictly enforced vaccinate-or-terminate policy for Covid-19 injections confirms its position that Covid-19 infection and transmission is a serious, ongoing concern.

94. Plaintiff objected to Disney's mandatory covid-19 vaccination, submitting her request for medical exemption, and being willing to discuss reasonable accommodation with Disney, indeed the equivalent of remaining in status quo with her fully remote position, if Disney had been willing to do so.

95. Disney engaged in prohibited employment practices under ADA by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of Disney's perception of their disability relating to or arising from their medical status.

96. Disney engaged in prohibited employment practices under the ADA when it failed to accommodate Ms. Hayes, particularly when accommodation would have been equivalent to status quo of her fully remote position.

97. Disney engaged in prohibited employment practices under the ADA when, upon denying Ms. Hayes' medical accommodation request, Disney unlawfully terminated her employment.

98. Disney engaged in prohibited employment practices under the ADA when it perceived Ms. Hayes as disabled and unable to complete the functions of her job in her medical status and unlawfully terminated her on the basis of this perception.

99. Even though Plaintiff clearly posed no health threat to Florida Disney employees and was nowhere physically present near Disney employees and guests, Disney treated Plaintiff as though she were a continually contagious vectors of disease and dangerous.

100. Indeed, Disney's improper "cherry-picking" of OSHA Rules and guidelines regarding industrial environment hazards and toxic materials to force only those cast like Ms. Hayes whom Disney perceived as disabled and dangerous to wear PPE for extended periods without respite (which were the "accommodations" provided by Disney to other cast, but denied to Ms. Hayes personally as accommodation), illustrates Disney's true sentiment and message that Ms. Hayes *is* the toxic substance or environmental hazard in the Disney workplace.

101. Disney's assumption of Ms. Hayes risk in the workplace is not based on any reasonable understanding of the facts regarding her ability to perform her essential job duties with or without accommodation. Indeed, Disney placed Ms. Hayes on a "rehire list" and offered her multiple job positions after it terminated her employment in November 2021. Defendant failed to make any individualized risk assessment regarding Ms. Hayes perceived disability. There was no factual support for the idea that Ms. Hayes could not perform her essential job duties as she had for fourteen years, including during the Covid-19 pandemic.

102. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Plaintiff's equal employment opportunities and her economic and non-economic damages. Disney's unlawful conduct has caused Plaintiff damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of her civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for a perceived disability.

103. Disney's conduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiff so as to entitle her to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

104. Plaintiff has exhausted her administrative remedies prior to bringing this claim before this Court. 42 U.S.C. § 2000e-5.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, order Disney to reinstate her employment, order Disney to cease

enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

**COUNT IV**
**DECLARATORY JUDGMENT**
**DISNEY VIOLATED EMPLOYEES' FLORIDA CONSTITUTIONAL**
**RIGHT TO PRIVACY ART I, § 23.**
***Against All Defendants***

105. Paragraphs 1-61 are hereby incorporated by reference as if fully restated.

106. As pled in this Complaint, Defendant The Walt Disney Company, by virtue of its total control and ownership over local Florida public entity and governmental agency RCID, is a state agency and subject to limitations and obligations of public entities under the Florida Constitution.

107. All other Defendants, as subsidiaries of The Walt Disney Company and as the entities through which The Walt Disney Company engages in its business in Florida, including within the jurisdiction of the RCID, are collectively, together with The Walt Disney Company, a local Florida public entity and governmental agency, subject to Florida's constitutional restrictions.

108. Disney's vaccinate-or-terminate mandate is unlawful because

- it violates the Plaintiff's constitutional right to privacy and bodily autonomy guaranteed by the Florida Constitution, Article I, Section 23;

- it violates the Plaintiff's constitutional right to due process and equal protection of the law guaranteed by the Florida Constitution Article I, Sections 2 and 9;

- it interferes with Plaintiff's exercise or enjoyment of constitutional and statutory rights using threats, intimidation, or coercion - Fl. Stat. § 760.51;

- it violates Fl. Stat. § 381.00315, which grants sole governmental authority in Florida to issue vaccine mandates to the "State Health Officer;"

- it violates Fl. Stat. §§ 381.0016, 112.0441, which forbid local governments and public employers from imposing vaccine mandates on their employees; and

- it is not narrowly tailored to serve a compelling public health or safety purpose as is required under Fl. Stat. § 252.38(4)(b).

109. There is a *bona fide*, actual, present and practical need for the declaration. Disney's violation of law is capable of repetition, but evading review.  Disney continued to impose a Covid-19 vaccine mandate against all recruits and new hires and rehires like Ms. Hayes until August of 2022, when it ostensibly dropped its vaccine mandates.  Disney justified its actions at all times relevant to the facts of this Complaint and indicated it had the authority to enforce at any time any manner of Covid-19 mandates: "These protocols are subject to change at any time."  **Exhibit F.**  While Disney "paused" enforcement of its

Covid-19 vaccine mandate in November 2021, the law which stayed Disney's enforcement is set to expire in 2023, without legislative action.

110. The declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to whether the Disney's vaccinate-or-terminate mandate violates Plaintiff's constitutional liberties and is otherwise unlawful.

111. An immunity, power, privilege or right of Plaintiff is dependent on the facts or the law applicable to the facts.

112. Ms. Hayes and Disney have, or reasonably may have, an actual, present, adverse and antagonistic interest in the subject matter, either in law or in fact.

113. The antagonistic and adverse interests are all properly before the Court.

114. The relief sought is not merely the giving of legal advice or the answer to questions propounded from curiosity.

WHEREFORE, Plaintiff seeks a declaratory judgment stating that Disney's Covid-19 vaccinate-or-terminate mandate violates Plaintiff's privacy rights under the Florida constitution and is otherwise unlawful; and an award to Plaintiff for her attorney's fees and costs; and order all such further relief as the Court deems necessary and just.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demands a trial by jury on all issues so triable.

Dated this 14th day of February, 2023.

/S/ Rachel L.T. Rodriguez,
RACHEL L.T. RODRIGUEZ, ESQ.
Florida Bar Number:110425
VIRES LAW GROUP, PLLC
515 N. Flagler Dr. Ste P300
West Palm Beach, FL 33401
(561) 370-7383
rrodriguez@vireslaw.group

/S/ Carroll G. Sanders
CARROLL G. SANDERS, ESQ.
Florida Bar Number: 52846
CGS LAW, P.A.
1101 E Cumberland Ave, Ste. 201H-133
Tampa, Florida 33602
(813) 279-8491
Carroll@CGSLAW.org

*Attorneys for Plaintiff*